DAVID M. ROSENBERG-WOHL (Cal. Bar No. 132924)
HERSHENSON ROSENBERG-WOHL,
A PROFESSIONAL CORPORATION
3080 Washington St.
San Francisco, CA 94115
(415) 317-7756
david@hrw-law.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLA MILLER, ELISA SCHWEIZER AND SHAI MILLER, | Case No.: 5:24-cv-7397 |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| CALIFORNIA DEPARTMENT OF EDUCATION, SANTA CLARA COUNTY OFFICE OF EDUCATION, SANTA CLARA COUNTY BOARD OF EDUCATION, UNIVERSITY PREPARATORY ACADEMY, TONY THURMOND, MARY ANN DEWAN, JESSICA BONDURIS, DAVID PORTER, RACHEL JULIANO, ALISHA HILL, LUCAS KELLEHER, AND DOES 1-10, | |
| Defendants. | |

## JURISDICTION AND VENUE

1. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims arising under the Constitution and laws of the United States. The Court has supplemental jurisdiction over Plaintiffs' State law claims because they "form part of the same case or controversy." 28 U.S.C. § 1367(a).

COMPLAINT - 1

2. The Court has authority to issue the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202.

3. Defendants' Constitutional violations are actionable under 42 U.S.C. § 1983.

4. Venue lies in this district under 28 U.S.C. § 1391(b), including because (i) at least one defendant resides in the Northern District of California and all defendants reside in the State of California, and (ii) a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California.

**THE PARTIES**

Plaintiffs

5. Plaintiff Ella Miller is thirteen years old. At the time of the events alleged herein, Ella was twelve years old, a middle school student, SY 23/24, at University Preparatory Academy in Santa Clara County, California. She resides with her family in San Jose, California. Ella is Jewish. She speaks Hebrew at home. She regularly spends time with family in Israel and has done so since she was four months old.

6. Plaintiff Elisa Schweizer is Ella's mother. She resides with her family in San Jose, California. She is Jewish.

7. Plaintiff Shai Miller is Ella's father. He resides with his family in San Jose, California. He is Jewish. He is also Israeli and a native Hebrew speaker.

Plaintiffs' family

8. Plaintiffs primarily speak Hebrew at home.

9. Plaintiffs have many close relatives in Israel. Of greatest relevance here are Ella's cousins. Shai's sister Inbal has three children: Raz, Ori and Zohr. Ori's fiancée, with

whom she grew up, is Yaron. Ella has spent summers in Israel with these four cousins since she was five years old.

10. All of these cousins are intimately involved in Israel's ongoing military defense against Hamas.

11. Raz until recently was in charge of Israel's missile defense system, Iron Dome, which has intercepted hundreds of rockets from Gaza.

12. Zohr serves near Tel Aviv, the prize target of continuously incoming rockets. As recently as September 7, a bomb fell close to the house where he lives with his parents (Inbal and her husband). In the same area, in Kibbutz Shamir, live three of Shai's sisters, their families, and Shai's parents, Ella's grandparents.

13. At the time of the events in this complaint, Ori and Yaron were serving in the Golani Brigade. Yaron still is.

14. The Galoni Brigade's unit consists of elite fighters who are on the front line. It was the Golani Brigade that was stationed closest to Gaza on October 7; its soldiers bore the brunt of the surprise attack at Nahal Oz and suffered the greatest losses of the Israeli military. 41 members of its 13th Battalion were killed and 91 were wounded at the Nahal Oz military base; 29 members of the 51st Battalion were killed at the base near the Kissufim kibbutz. To put this is context, this number of fatalities far exceeds the fatalities this battalion suffered during the Six Day War and the Yom Kippur War combined.

15. As luck would have it, Ori and Yaron were both off-duty on October 7. Zohr was on duty, at his base. As reports of the deaths came in, soldiers were not identified by name until their families had been notified. It took days to get phone calls through to friends

and family to find out if they were okay. Ori and Yaron were immediately summoned back to base and thereafter were inaccessible, their whereabouts uncertain.

16. Ori has attended the recent funerals of more than 30 friends and co-workers, including that of Yaron's best friend from elementary school (serving with the Golani Unit), and one of Ori's closest friends.

17. On December 12, 2023, the Golani Brigade was engaged in clearing buildings in Gaza City. Someone had to stay with the truck. The soldier whose turn it was asked Yaron to cover for him while he went into the building with the team. Despite his reluctance, Yaron agreed. Those soldiers didn't make it out alive. Seven of Yaron's comrades were killed in the explosions of the booby-trapped building and in the subsequent ambush and firefight, including the commander of his 13th Battalion. Yaron still struggles with his fateful decision.

18. Ella was aware of all this in real time, as she continues to be aware of ongoing developments in the war, with the attendant risks undertaken by her cousins in the army and with the daily safety of her Israeli family.

Institutional defendants

19. Defendant University Preparatory Academy (UPA) is a charter school. It received State funding to educate its students, but it is organized as a nonprofit public benefit corporation and as such it is operated not by the State but by an outside entity. Specifically, UPA operates under a 5-year performance contract (*i.e.*, a "charter"). In exchange for assuming specifically agreed-upon responsibilities under the contract, UPA is able to exercise greater autonomy than non-charter schools.

20. At the bottom of the registration form filled out by Ella and Elisa on March 25, 2023, Ella and Elisa were asked to confirm that they had read and agreed to the terms of the school policies expressed in the Student Handbook, and they signed their respective agreements thereto.

21. **UPA's Student-Family Handbook, 2023-24** states clearly (in relevant parts):

   a. "University Preparatory Academy's strength is derived from a plurality of voices, experiences, and backgrounds. The University Preparatory Academy Board and Staff commit to raise our voices against racism, unconscious bias, intolerance, injustice, and discrimination starting by reflecting on our own policies and actions. University Preparatory Academy will continue to build an environment that celebrates an individual's race, gender, orientation, belief system, and culture by giving voice to each other's experiences, and recognizing our diversity knowing that we are stronger together."

   b. Its "Values" include "*Accountability*: Recognize the impact of actions and responsibilities for one's education" and "*Community*: Maintain a safe and supportive environment for all."

   c. Its "Student Learning Outcomes" include "Develop understanding and respect of diversity" and "Demonstrate digital literacy and responsibility" and "Demonstrate personal social responsibility to the community."

   d. Regarding its "Learning Environment, UPA offers an environment allowing "students, teachers, staff and parents to develop common bonds and positive, productive relationships that are conducive to a highly effective teaching and learning environment."

COMPLAINT - 5

e.  "We expect that each individual will be treated with dignity and respect, and that there will be an appreciation for the diversity of our parents, students, and staff."

f.  "UPA does not condone or tolerate harassment of any type, including discrimination, intimidation, or bullying" by any student and commits to "promptly and thoroughly investigate any complaint of harassment and take appropriate corrective action."

g.  "UPA believes all students have the right to a safe and civil learning environment. Discrimination, sexual harassment, intimidation, and bullying are all disruptive behaviors which interfere with students' ability to learn, negatively affect student engagement, diminish school safety, and contribute to a hostile school environment. As such, UPA prohibits any acts of discrimination, sexual harassment, harassment, intimidation, and bullying altogether. This is inclusive of instances that occur on any area of the school campus, at school-sponsored events and activities, regardless of location, through school-owned technology, and through other electronic means."

h.  UPA defines "'discrimination, sexual harassment, harassment, intimidation, and bullying'" "as the intentional conduct, including verbal, physical, written communication, or cyberbullying, including cyber sexual bullying, based on the actual or perceived characteristics of disability, pregnancy, gender, gender identity, gender expression, nationality, ancestry, race or ethnicity, immigration and citizenship status, religion, religious affiliation, sexual orientation, childbirth or related medical conditions, marital status, age, or association with a person or group with one or more of these actual or perceived characteristics or any other

basis protected by federal, state, local law, ordinance or regulation. In addition, bullying encompasses any conduct described in the definitions set forth in this Policy. Hereafter, such actions are referred to as 'misconduct' prohibited by this Policy."

i. "To the extent possible, UPA will make reasonable efforts to prevent students from being discriminated against, harassed, intimidated and/or bullied, and will take action to investigate, respond, and address and report on such behaviors in a timely manner. UPA staff who witness acts of misconduct prohibited by this Policy will take immediate steps to intervene when safe to do so."

j. "Moreover, UPA will not condone or tolerate misconduct prohibited by this Policy by any employee, independent contractor or other person with whom UPA does business, or any other individual, student, or volunteer. This Policy applies to all employee, student, or volunteer actions and relationships, regardless of position or gender. UPA will promptly and thoroughly investigate any complaint of such misconduct prohibited by this Policy and take appropriate corrective action, if warranted."

k. "It is a crime to engage in hazing activities. In addition, any student who participates in hazing, or any act that causes or is likely to cause personal humiliation or disgrace will be referred for suspension and/or expulsion. (Ed.Code32050-32052)"

l. "Bullying (Intentional Harassment)

m. Definition: UPA defines bullying as repeated and systematic abuse and harassment of another or others. Bullying and ridiculing-type of behavior includes

name-calling, mimicking, indifference and exclusion, invasions of personal space,

inappropriate touching, physical violence, hitting, biting, kicking, and pushing,

shoving, gender discrimination due to sexual orientation, sex-biased bullying, and

extortion."

n.  "Specific observable bullying behavior:

•Deliberately hurtful teasing, taunting, name calling, ridicule, intimidation,

belittling, degradation, threats and demands;

•Domination and subduing are used repeatedly against the victim by the bully;

•Derisive and unfriendly mockery and laughter are directed at the victim;

•Isolation and exclusion of the victim is common among females who bully;

•Internet chatrooms, email, text messaging to telephones or pagers, and postings

to "webblogs" are common forums for bullying;

•Physically aggressive moves are common and frequently used against the victim

who is unable to defend her/himself."

o.  According to UPA, "Students may be suspended for any of the following acts

when it is determined the pupil [selective portions quoted below]:

1.  Caused, attempted to cause, or threatened to cause physical injury to another

person.

15. Harassed, threatened, or intimidated a student who is a complaining witness or

witness in a school disciplinary proceeding for the purpose of preventing that

student from being a witness and/or retaliating against that student for being a

witness.

20. Caused, attempted to cause, threaten to cause or participated in an act of hate violence, as defined in subdivision(e) of Section 233 of the Education Code. This section shall apply to pupils in any of grades 4 to12, inclusive.

21. Intentionally. harassed, threatened or intimidated a student or group of students to the extent of having the actual and reasonably expected effect of materially disrupting classwork, creating substantial disorder and invading student rights by creating an intimidating or hostile educational environment. This section shall apply to pupils in any of grades 4 to12, inclusive.

22. Engaged in an act of bullying, including, but not limited to, bullying committed by means of an electronic act, as defined in subdivisions (f) and (g) of Section 32261 of the Education Code, directed specifically toward a pupil or school personnel.

23. A pupil who aids or abets, as defined in Section 31 of the Penal Code, the infliction or attempted infliction of physical injury to another person may be subject to suspension, but not expulsion…"

p. According to UPA, "Students may be expelled for any of the following acts when it is determined the pupil [selective portions quoted below]:

1. Caused, attempted to cause, or threatened to cause physical injury to another person.

15. Harassed, threatened, or intimidated a student who is a complaining witness or witness in a school disciplinary proceeding for the purpose of preventing that student from being a witness and/or retaliating against that student for being a witness.

20. Caused, attempted to cause, threaten to cause or participated in an act of hate violence, as defined in subdivision (e) of Section 233 of the Education Code. This section shall apply to pupils in any of grades 4 to 12, inclusive.

21. Intentionally harassed, threatened or intimidated a student or group of students to the extent of having the actual and reasonably expected effect of materially disrupting classwork, creating substantial disorder and invading student rights by creating an intimidating or hostile educational environment. This section shall apply to pupils in any of grades 4 to 12, inclusive.

22. Engaged in an act of bullying, including, but not limited to, bullying committed by means of an electronic act, as defined in subdivisions (f) and (g) of Section 32261 of the Education Code, directed specifically toward a pupil or school personnel.

23. A pupil who aids or abets, as defined in Section 31 of the Penal Code, the infliction or attempted infliction of physical injury to another person may be subject to suspension, but not expulsion…".

22. **In its Charter Petition for Reauthorization**, 9/9/19, submitted to the SCCBOE, David Porter, Executive Director of UPA, stated: "I understand that if awarded a renewed charter, University Preparatory Academy: … Shall not discriminate on the basis of the characteristics listed in Section 220 (actual or perceived disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, or association with an

individual who has any of the aforementioned characteristics). [Ref. Education Code Section 47605.6(e)(1)]"

23. **Within that Charter Petition,** UPA promised:

    a.  "UPA provides a strong, supportive, small school environment for students to excel academically."

    b.  **"**UPA does not discriminate against any student on the basis of the characteristics listed in Section 220 (actual or perceived disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, or association with an individual who has any of the aforementioned characteristics)."

    c.  "UPA has adopted the California state standards as the framework for our curriculum. As required by law, UPA students will take the required state standardized tests. Approved textbooks and instructional materials support the UPA curriculum. UPA core curriculum materials and textbooks for 7th and 8th grades have been selected from the list of state-required textbooks. Ninth through twelfth grade non-advanced placement textbooks are California State Standards-aligned. UPA uses College Board-required textbooks and instructional materials for advanced placement classes."

    d.  "The Charter School is committed to providing a school that is free from discrimination and sexual harassment, as well as any harassment based upon the actual or perceived characteristics of race, religion, creed, color, gender, gender identity, gender expression, nationality, national origin, ancestry, ethnic group

identification, genetic information, age, medical condition, marital status, sexual orientation, sex and pregnancy, physical or mental disability, childbirth or related medical conditions, military and veteran status, denial of family and medical care leave, or on the basis of a person's association with a person or group with one or more of these actual or perceived characteristics, or any other basis protected by federal, state, local law, ordinance or regulation. The Charter School shall develop a comprehensive policy to prevent and immediately remediate any concerns about discrimination or harassment at the Charter School (including employee to employee, employee to student, and student to employee misconduct).

Misconduct of this nature is very serious and will be addressed in accordance with the Charter School's anti-discrimination and harassment policies."

24. Defendant California Department of Education ("CDE") is ultimately responsible for UPA, as it is a public charter school operating in California. CDE receives federal funding.

25. Defendant Santa Clara County Office of Education ("SCCOE") through its Charter Schools Department provides oversight for UPA (*e.g.*, SCCOE serves as UPA's "sponsor") under the direction of the County Superintendent, which oversight includes assuring that UPA operates consistent with its charter and state and federal law. Whether independently of CDE or through CDE, SCCOE receives federal funding.

26. Defendant Santa Clara County Board of Education ("SCCBOE") approved UPA as a charter school and through public hearings and otherwise has responsibility for inquiring into and responding to concerns at UPA, which includes assuring that UPA operates

COMPLAINT - 12

consistent with its charter and state and federal law. Whether independently of CDE or through CDE or SCCOE, SCCBOE receives federal funding.

<u>Individual Defendants</u>

27. Defendant Tony Thurmond ("Thurmond") is the California State Superintendent of Public Instruction and the head of the CDE. As such Thurmond bears ultimate responsibility for the atmosphere in public schools such as UPA.

28. Defendant Mary Ann Dewan ("Dewan") was, at all relevant times, the Santa Clara County Superintendent of Schools and as such oversaw SSCOE and directed its Charter Schools Department. On information and belief, she resides in this judicial district.

29. Defendant Jessica Bonduris ("Bonduris"), the present Santa Clara County Superintendent of Schools was, at all relevant times, Associate Superintendent and responsible for implementing the direction of Dewan. On information and belief, she resides in this judicial district.

30. Defendant David Porter ("Porter") is and was at the relevant times of this complaint the executive director of UPA. As such Porter bears direct responsibility for creating and maintaining the atmosphere that led to the events alleged herein, as well as for failing to redress the conduct alleged herein. On information and belief, he resides in this judicial district.

31. Defendant Rachel Juliano ("Juliano") is and was at the relevant times of this complaint the 7th grade counselor at UPA. As such Juliano bears direct responsibility for creating and maintaining the atmosphere that led to the events alleged herein, as well as for failing to redress the conduct alleged herein. On information and belief, she resides in this judicial district.

32. Defendant Alisha Hill ("Hill") is and was at the relevant times of this complaint the Dean of Students at UPA. As such Hill bears direct responsibility for creating and maintaining the atmosphere that led to the events alleged herein, as well as for failing to redress the conduct alleged herein. On information and belief, she resides in this judicial district.

33. Defendant Lucas Kelleher ("Kelleher") is and was at the relevant times of this complaint the Director of Student Services at UPA. As such Kelleher bears direct responsibility for creating and maintaining the atmosphere that led to the events alleged herein, as well as for failing to redress the conduct alleged herein. On information and belief, he resides in this judicial district.

34. Collectively, Porter, Juliano, Hill and Kelleher are referred to herein as the UPA individual defendants. Each was directly involved in hearing and failing to respond, whether at all or sufficiently, to the facts brought to their attention by Ella and her parents.

35. All individual defendants are sued in their individual capacities only.

**FACTUAL BACKGROUND**

UPA pre-October 7

36. In school year 2023-24, Ella attended the seventh grade at UPA.

37. School began August 24; back to school night was not auspicious – the history classroom was decorated with maps of the modern Middle East in which Israel was erased. Shai noticed this; Ella did not want him to make a fuss at her new school.

38. As school began, classmates introduced themselves; a number of Ella's classmates were visibly Muslim, in that they were girls wearing head scarves. During introductions, Ella

does not remember any classmate identifying as Palestinian. She identified herself as Israeli-American.

39. Within a few days, conversation turned to who spoke what languages. Ella offered that she spoke Hebrew. Other girls stated that they spoke Arabic, Portuguese. Some knew Latin.

40. So far as Ella knows, there are only two other Jewish students in the school: one very quiet girl who stays pretty much to herself and a boy. Neither speaks Hebrew at school, identifies themselves as Jewish in the school environment or, on information and belief, were identified as Jewish by classmates, teachers, or administration.

October 7

41. On October 7, 2023, Hamas terrorists attacked Israel. It is important to underscore those four words. Hamas is not the Palestinian people; it is a US and internationally designated terrorist organization that rules those Palestinians who happen to live in the Gaza Strip. Hamas targeted Israeli civilians with rockets before breaching the border between the Gaza Strip slaughtering over a thousand young people at a music concert near Re'im, the elderly and babies in small residential communities in Kfar Aza, Be'eri, Nir Oz, Nahal Oz, Re'im, Holit, Zikim, Kerem Shalom, Sufa, and the town of Sderot. It was not just the targeting of civilians that constitutes terror but the intentional fear and horror communicated through the age range of the victims and the manner in which they were killed, to say nothing of the featured sexual violence against Israeli women, including through rape and genital mutilation. Many victims could not be identified due to their condition.

42. Israel is a sovereign nation state, the only nation founded explicitly by a United Nations resolution, Assembly Resolution 181, which partitioned Palestine in 1947. The only reason Israel has borders that are larger than those marked on the partition map is that it had to fight off the Egyptian Expeditionary Force, the Jordanian Arab Legion, the Syrian Army, the Lebanese Army, the Iraqi Army and various Palestinian Arab militias and in so doing conquered territory. The territory conquered – now commonly referred to territory within the "Green Line" that marked the end of hostilities in 1949, included Tel Aviv and Haifa and parts of the Old City of Jerusalem, along with the Galilee (to the north) and the Negev Desert (to the south).

43. From 1948 to 1967, Egypt controlled the Palestinian population living in what is now Gaza, and Jordanian citizenship was provided to Palestinian residents in what is now the West Bank.

44. In the Six-Day War in 1967, Israel responded to years of increasing tension with Egypt, Jordan and Syria, and the risk of imminent attack as a result of the Arab Coalition recently formed by the three nations and Egypt's expulsion of UN peacekeepers from the Sinai Peninsula, its closure of Israel's maritime route to the Red Sea (the Strait of Tiran) and mobilization of its army. Israel attacked preemptively, pushing the Egyptians out of Gaza and the Jordanians out of the West Bank (and the Syrians out of the Golan Heights).

45. 2 million Palestinians live as citizens within Israel proper. These Arab Israelis comprise 20% of Israel's population. There are several Arab political parties and representatives in Israel's legislature, the Knesset. They comprise approximately 15% of the doctors there.

46. Israel unilaterally withdrew from Gaza in 2005, removing 21 settlements, 8,000 settlers and its military presence on the ground, retaining military control of its naval and air

borders, while Egypt controls the Rafah crossing, the major connection between Gaza and the world. Gaza currently holds about 2.3m Palestinians; the West Bank holds about 3.2m.

47. Ever since 1967, various parties involved in the Middle East have advanced numerous proposals for the "two state solution." This has been the express position of the United States for decades. Even today, a plurality of Americans, according to a recent Pugh poll, believe the best outcome is a two-state solution.

48. Reasonable people disagree over where these state borders should be, how they should be negotiated, and how they should be determined, and even over which parties (or members of which parties) do and don't want to reach a "solution" at a given time. Reasonable people do not believe that Palestinians should eradicate the State of Israel any more than they believe that Israel should expel the Palestinians from Gaza and the West Bank. Regardless of one's view of history, the land contains two peoples who are not going anywhere and need to find a way to live together.

49. The Israeli government of Likud, presently headed by Benjamin Netanyahu, is open to a form of Palestinian self-rule but is skeptical of a two-state solution, fearing the security of Israel's borders on the one hand and a demographic transformation of a Jewish state into an Arab state on the other.

50. The Palestinian Authority, governing in parts of the West Bank, supports a two-state solution based upon pre-1967 borders, *i.e.*, roughly based upon the Green Line, and it wants all Palestinians expelled pre-1967 to have the right to return to Palestine.

51. Hamas, governing all of Gaza, in its charter, explicitly calls for the destruction of Israel and the imposition of an Islamic state throughout historic Palestine.

52. As of October 6, 2023, the situation remained intractable. Since it assumed power in 2007, Hamas had fought no less than 4 wars with Israel, the most recent ending with an Egyptian-mediated cease fire effective May 21, 2021. On May 7, Hamas attacked again. While the earlier conflicts had been largely conducted by rocket fire, this one was a ground campaign of terror and hostage-taking.

UPA post-October 7

53. The Monday after the attack, October 9, Ella came to school upset at news of the attack and fear and uncertainty regarding the safety of her family. She was crying. Nobody spoke with her except for one girl in her small group. Mostly, classmates just stared at her.

54. Right after lunch, Ella had World History. Upset and needing to get control of herself, Ella asked her teacher, Steve Guevara to be excused to go to the bathroom. Mr. Guevara told Ella she could not go to the bathroom until she read aloud to the entire class a passage he had selected to the effect that in the past Palestinians and Jews had gotten along. This requirement to publicly espouse a position that was at odds with present-day reality was overwhelmingly oppressive and humiliating. It also further identified Ella as "the Jew" to her classmates. Given that the topic of the class at that time was Muslim history, the identification served to further "other" her to her classmates and identify her family, culture and religion as hostile to and at war with peaceable Palestinians.

55. The very next day, October 10, two Muslim female classmates wearing hijabs approached Ella during lunch, told her they were Palestinians, and demanded, "What do your people think about the conflict?" When Ella tried to answer, they both began to scream at her. They screamed, "You're lying– Jews are terrorists." They demanded, "Do

you know that your family in Israel is living on stolen land?" This was terrifying and upsetting for Ella.

56. By October 12, Ella realized that she was no longer popular. She had gone from having a group of about 30 girls as friends to only one girl who would even talk to her. She often heard girls whispering about her, which was painful and humiliating.

57. October 13 was the Friday of that week. That day, the same two Muslim girls approached Ella. This time, one of them showed Ella her phone, which displayed an Instagram post that said, "All Muslims Must Die." She said, "See, because of your people, everyone hates us!" Ella looked at the phone. "It was a non-Jewish person who posted that," she said. "What does that posting have to do with Jews?" The girls had no answer but immediately after they had confronted her, Ella heard rumors spreading throughout the middle school, including, "Jews are terrorists" and "the Israelis are living on stolen land." Ella was now called "White Ella," and the charge now became personal: "White Ella's family are terrorists."

58. Ella's mother, Elisa, met with UPA's Dean of Student Services, Dr. Alisha Hill, about the antisemitism and bullying Ella had been suffering that week and seeking prompt, effective action. Dr. Hill assured Elisa she would raise the issue with UPA Executive Director David Porter and fix this.

59. On Monday the 16th two boys joined the fray. They ran after Ella twice around the school while she was speaking on her phone in Hebrew to a friend in Israel, yelling "We want you die" and mocking the Hebrew language. Ella had to run to the office to get away from them and feel safe.

COMPLAINT - 19

60. Ella's mother and father reached out to meet with Porter directly on October 16. His assistant, Natalie Tran, told Ella's mother the soonest they could have a meeting was the next Monday, October 23rd.

61. Two days later, Wednesday the 18th, the two Muslim girls were back at it, now accusing Ella of being a terrorist. They kept screaming this at her until she got away from them.

62. The morning of the scheduled meeting on October 23, Porter's assistant called and said he would not be able to meet and rescheduled for the following day. That next Tuesday, the 24th, Ella's family was told that Porter was sick and that he wanted to reschedule further. Ella's parents insisted, expressing that this was of immediate concern as Ella felt in real danger. Only then did Porter agree to speak with Ella's parents.

63. Porter denied knowing anything about Ella's situation. He asked to hear about the situation from Ella herself, which she communicated to him. Elisa provided Porter with a letter from the Jewish Community Relations Council ("JCRC") which offered many suggestions as to how educators could help combat antisemitism, as well as ways to talk to children who are affected by war.

64. Nothing changed.

65. On Monday, November 13, Ella was now greeted by a classmate who addressed her simply as "Jew." She said "Hi Jew," instead of addressing Ella by her name. It was a girl in her math class. Her response was, "You know I have a name, right? My name is Ella." From then on, other kids simply called her "Jew" -- "Hi Jew or Hey Jew." If she ever protested, they said they thought it was "funny." Ella tried her best to ignore them.

66. Tuesday, November 14 was an in-person meeting between Ella and Elisa and Ella's 7th grade counselor, Rachel Juliano. Rachel appeared to not know about any of the previous

meetings with the administration, so, again, Ella had to retell her story and ask for help. Rachel promised she would immediately go into the staff meeting and inform all the staff of what had transpired.

67. On November 15, Elisa and Rachel exchanged emails. Elisa again provided a copy of the JCRC letter, providing the school with resources to combat antisemitism and assist educators in talking to children about war.

68. On November 28, Ella and her parents met on Zoom with Juliano, Hill, and the Director of Student Services, Lucas Kelleher to discuss ways to keep Ella safe on campus, not just during the school day but before and after school, when there was limited supervision if any. (Ella's family decided it was safer for Ella to meet by Zoom, as they were concerned that if the students saw Ella's parents talking to the administration on campus they would further retaliate against Ella, making her life at school even more unbearable.)

69. Nothing happened.

70. On December 5, the two Muslim told Ella and her friend that they had learned that someone had "snitched' on them. "Snitches get stiches," they had said. They tell Ella and that if they find out who it is they will "jump them" and "beat the shit out of that person." Ella called her mother from school and let her know. Ella's mother, Elisa, immediately let the counselor, Rachel know. This made Ella's family concerned that complaints were only jeopardizing Ella's safety further. The school administrators were aware of this concern.

71. On December 15, Ella and her friend witnessed a UPA teacher during lunch handing out the black and white head scarf (keffiyeh) to a group of students who were also carrying

around Palestinian flags. While online and officially this is the "Muslim Club," the club was popularly known as the" Pro-Palestinian club."

72. On December 21 Elisa had another Zoom meeting with Juliano, Hill, and Kelleher, to learn what was being been done to educate and eradicate bullying and antisemitism. What Elisa learned was nothing had been done and, specifically, that Porter had not approved assisted conversations to educate the children on the facts of the developing international conflict, which is what Elisa had been begging for as suggested by the JCRC, nor had he approved any type of speaker or any proactive response regarding either Ella's safety or how the school should this matter educationally and/or socially.

73. Throughout this period of harassment, Ella was afraid for her safety. She was on edge during the school day and at any time outside of instruction. She was apprehensive after school, awaiting pickup by her parents anxiously; she would seek to wait inside the school, but was told she could not.

74. As a result, immediately following the holiday break, on Monday, January 9, 2024, Ella's parents withdrew her from UPA. At that time, Ella met in person with UPA's Registrar, Arica Clement. She appeared surprised at Ella's experiences at the school, expressed sympathy, and said she had not been informed of the antisemitism Ella had endured at UPA.

75. The CDE issued no directives to public schools including UPA as to how to address possible tension against students who are Jews, Israelis or those perceived as Zionists after October 7. Nor did the CDE ever inquire of public schools including UPA as to the existence of such tensions or safety concerns of such students in the aftermath.

76. The SCCOE issued no directives to public schools including UPA as to how to address possible tension against students who are Jews, Israelis or those perceived as Zionists after October 7. Nor did the SCCOE ever inquire of public schools including UPA as to the existence of such tensions or safety concerns of such students in the aftermath.

77. The SCCBOE issued no directives to public schools including UPA as to how to address possible tension against students who are Jews, Israelis or those perceived as Zionists after October 7. Nor did the SCCBOE ever inquire of public schools including UPA as to the existence of such tensions or safety concerns of such students in the aftermath.

78. UPA has consistently failed to address either the harassment experienced by Ella and her family or to promote any healthy and respectful way of dealing with the Gaza-Israel conflict at school.

79. On information and belief, UPA received no complaint about harassment of students identifying as or perceived as Palestinian or Muslim either before October 7 or afterwards.

80. UPA has issued only one statement, to parents, and that was as late as October 25, as Israel's ground invasion was imminent (it commenced October 28). That statement said nothing about the Hamas terrorist attack, nothing about Israeli civilian casualties, nothing about the most severe existential threat to Israel's existence in years. UPA's response was both banal and clinically distant, reflecting business as usual. While "[s]ome among our community may possess deep personal ties to this crisis, experiencing pain and carrying apprehensions and anxieties," there was no acknowledgement of any apprehensions and anxieties already expressed to the school. UPA did point out though that its values were up to the challenge: "we strive to teach our students to be critical thinkers that embrace

diversity and promote acceptance in an ever changing world," and in particular that "UPA stands against anti-Semitism and islamophobia."

81. UPA's board never addressed the Gaza-Israel conflict or its effect on UPA's students in the time period in which Plaintiff was at school. In its monthly meeting of October 26, the notable question of discussion was whether a student's grade should be changed. There was a Board retreat on October 28. Nothing came of this. On November 30 UPA founder Mrs. Jackie Guevara addressed the board presenting the success of the school. Another change of grade request was considered (and an expulsion matter) on December 21. In the first report of 2024, there were a lot of reports submitted to the Board meeting, none regarding the school's abject failure to deal with Ella and her family and keep Ella in the school.

82. UPA never inquired of its administrators, faculty, or students concerning the existence of tensions involving students who are Jewish Israeli or perceived as Zionists, or safety concerns of such students in the aftermath of October 7.

83. On January 10, Ella attended the public meeting of the SCCBOE/SCCOE. She spoke in opposition to a resolution blaming Israel for the conflict in Gaza misleadingly claiming to be a resolution promoting "peace and safety" for children, drawing upon the harassment and discrimination she had just experienced at UPA.

84. The SCCBOE Board/SCCOE issues regularly monthly resolutions in support of one group or another. This is what the calendar reflects from October, 2023 to October, 2024:

- October 4, 2023: indigenous people and tribal communities
- October 4, 2023: Sikh awareness and appreciation month
- December 13, 2023: Fred Korematsu Day of Civil Liberties and the constitution
- January 10, 2024: Korean American Day
- January 31, 2024: Black History Month

- February 21, 2024: Womens History Month
- March 20, 2024: Arab American Heritage Month
- April 20, 2024: Jewish American Heritage Month
- April 17, 2024: Acknowledging Anniversary of Fall of Saigon
- May 15, 2024: Caribbean American Heritage Month
- May 15, 2024: LGBTQ Pride Month and Harvey Milk Day
- May 15, 2024: National Immigrant Heritage Month
- June 5, 2024: Juneteenth
- July 17, 2024: American Muslim Appreciation Awareness Month
- September 4, 2024: National Hispanic Heritage Month
- October 2, 2024: LGBTQ+ History Month

85. Unlike any other resolution considered by the SCCBOE Board/SCCOE AND DEWAN, the so-called "Sustained Peace and Safety for All Children" resolution of January 10, 2024 had no connection to the job of educating students or respecting difference. Instead it was political and partisan, pouring gasoline on flames for a partisan agenda.

86. That agenda was – and continues to be promoted by the Council for Arab-Islamic Relations ("CAIR"), an organization, Plaintiffs allege and on that basis are informed and believe, that seeks to reverse any balanced view of the conflict in the Middle East and lay the blame squarely upon the existence of the State of Israel.

87. The two SCCBOE Board members proposing the measure were (and on information and belief, still are) closely related to CAIR leadership. One, Board president Maimona Afzal Berta, is an alumna of CAIR's youth leadership program and the daughter of a CAIR board member. One, Raeena Lari, was supported by CAIR in her campaign for board membership. During debate over the resolution each insisted that the resolution contain a politically tilted definition of cease-fire. At no point was it ever recognized that there had been a cease fire on October 6, and that a true, objective cease-fire would have necessitated the unilateral return of hostages by Hamas.

88. Of the 132 members of the public whose comments were heard by the SCCBOE Board/SCCOE, Ella was the only public school student to speak to the Board (by way of her actual experience at a school) concerning the toxic antisemitic and anti-Zionist atmosphere at a school within the jurisdiction of SCCBOE/SCCOE. Specifically, she explained that the atmosphere in the schools was injurious and hazardous to students such as herself, that she had experienced discrimination and harassment, and that passage of this resolution would do nothing but inflame the situation.

89. There was no response by any SCCBOE Board member to Ella or Elisa (who had also addressed the Board) at the time or thereafter, nor from SCCOE. On information and belief, the SCCOE Board neither inquired of UPA nor discussed the matter with SCCOE. The SCCOE Board never addressed either the harassment experienced by Ella and her family or took efforts to promote any healthy and respectful way of dealing with the Gaza-Israel conflict at school. Instead, upon reconvening January 29, 2024 the SCCBOE Board/SCCOE doubled down on the political tilt of the resolution by referring to the release of Palestinian prisoners in jail as a result of legal proceedings as parallel to the Israeli terrorist-seized hostages, viz., "the release of all hostages in the Middle East, including Palestine and Israel."

90. In adopting the Resolution Recognizing Sustained Peace and Safety for All Children, SCCBOE predicated its adoption upon its "commit[ment] to promoting inclusive and just conditions where all our students … and families feel a sense of belonging," embracing not just its prior resolution denouncing antisemitism of 6/14/23 but the "Dear Colleague" letter from the DOE, Office of Civil Rights, dated 5/25/23. That Dear Colleague letter identified as violative of Title VI discrimination against students who are Jewish based

upon concepts of "race," "color," and "national origin," which itself includes actual or

perceived ethnicity, speaking a foreign language, and "citizenship or residency in a

country with a dominant religion or distinct religious identity."

Complaint process

91. On January 22, Elisa submitted a formal UCP complaint with SCCOE in which she

explained that both she and Ella had spoken at the recent School Board meeting about

these issues.

92. On March 24, the 60 days for SCCOE to resolve a UCP complaint had passed.

93. On May 6, a spokesperson for the Bay Area Jewish Committee, Maya Bronicki, met with

SCCOE Superintendent Dr. Dewan, and asked her to intervene and follow up on the

complaint. Nothing happened. On information and belief, Dewan simply dropped the

matter.

94. On May 14, 113 days after submission, far in excess of the required time period for a

response, SCCOE issued a response to the complaint, stating that their oversight of the

charter school was not encompassed within the scope of the complaint, and stated that the

complaint could be filed with the California Department of Education ("CDE").

95. Ella's parents, Elisa and Shai did just that on June 5, identifying the chronology above.

96. On June 10, the CDE said that it had referred the complaint to Porter and that he had

sixty (60) days to respond, *i.e.*, by July 13. On information and belief, UPA never

responded to CDE. On information and belief, CDE never followed up. UPA never

followed up with Ella or her family.

97. There has been no further response to the complaint, whether from the CDE, SCCOE,

SCCBOE, UPA or Porter or otherwise, as of the date of the filing of this lawsuit.

**CLAIMS FOR RELIEF**

**FIRST CLAIM, 42 U.S.C. § 1981, Freedom To Contract**

98. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

99. Under 42 U.S.C. section 1981, all persons "have the same right in every State … to make and enforce contracts … as is enjoyed by white citizens." Separately, all persons "have the same right in every State … to the full and equal benefit of all laws … for the security of persons … as is enjoyed by white citizens."

100. This statute has been construed to provide protection to all those who are not considered "white" by some, whether due to race, religion, ethnicity, ideology or ethnicity.

101. The rights here extend to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

102. The rights here are "protected against … impairment under color of State law."

103. The UPA registration form and Student-Family Handbook constituted a contract between UPA and Ella and her family, under which UPA made certain promises in exchange for agreeing to attend UPA. As a result of that agreement, UPA received State and federal funds to educate Ella.

104. As a result of the discrimination and harassment Ella experienced, violation of state and federal law and policy as set forth in the contract and otherwise, UPA and the UPA individual defendants breached this contract.

105. Because UPA and the UPA individual defendants refused to provide Ella and her family the same contracted-for benefits as other white students and families, they deprived Ella and her family of the benefits of section 1981.

106.     Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

107.     As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

108.     As a direct and proximate result of the action and inaction of UPA and the UPA individual defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**SECOND CLAIM, 42 U.S.C. § 1983, Equal Protection Clause**

109.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

110.     Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

111.     The Equal Protection Clause prohibits discrimination on the basis of religion, race, and ethnicity.

112.     The Equal Protection Clause prohibits discrimination on the basis of opinion.

113.     42 U.S.C. section 1983 affords protection from the "deprivation of any rights … secured by the Constitution."

114.    Thurmond failed to address the Gaza-Israel conflict proactively so as to prevent harassment and discrimination of those who are ethnically and religiously Jewish and/or Israeli and/or are perceived to be Zionists in California's public schools, or those whose opinions were supportive of the victims of Hamas terror and the continued existence of the Jewish state. Specifically, he could have issued policy directives, along with reporting and enforcement directives. In so doing, he promoted the sense that California's public school system identified with not just the Palestinian cause but Hamas terrorism and rising antisemitism and anti-Zionism in the schools. This was deliberate indifference. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, Thurmond compounded the injuries suffered by Plaintiffs.

115.    Dewan and Bonduris failed to address Plaintiffs' complaints and concerns that Ella was being harassed and discriminated against because she was ethnically and religiously Jewish and Israeli and was perceived to be a Zionist of equal protection of the laws through a policy and practice that treats Plaintiffs differently than similarly situated individuals. In so doing they discriminated against Ella's parents as well by treating their complaint differently than if it had been made on other grounds. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference.

116.    UPA and the UPA individual defendants, have knowingly allowed students to discriminate against and harass Ella because she is ethnically and religiously Jewish and Israeli and is perceived to be a Zionist. They have knowingly failed to address Ella and her parents' complaint because they are ethnically and religiously Jewish and Israeli and

are perceived to be Zionists. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

117.    There was no legitimate or compelling state interest for any of this, nor any narrowly tailored response to serve such an interest.

118.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

119.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

120.    As a direct and proximate result of the action and inaction of Thurmond, Dewan, Bonduris, UPA and the UPA individual defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**THIRD CLAIM, California Constitution Art. I, § 7(a), Equal Protection Clause**

121.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

122.     Under California's Equal Protection Clause, "[a] person may not be … denied equal protection of the laws." Cal. Const. art. 1, § 7(a). The Clause prohibits discrimination based on race, ethnicity, and religion.

123.     The Equal Protection Clause prohibits discrimination on the basis of opinion.

124.     Thurmond failed to address the Gaza-Israel conflict proactively so as to prevent harassment and discrimination of those who are ethnically and religiously Jewish and/or Israeli and/or are perceived to be Zionists in California's public schools, or those whose opinions were supportive of the victims of Hamas terror and the continued existence of the Jewish state. Specifically, he could have issued policy directives, along with reporting and enforcement directives. In so doing, he promoted the sense that California's public school system identified with not just the Palestinian cause but Hamas terrorism and rising antisemitism and anti-Zionism in the schools. This was deliberate indifference. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, Thurmond compounded the injuries suffered by Plaintiffs.

125.     Dewan and Bonduris failed to address Plaintiffs' complaints and concerns that Ella was being harassed and discriminated against because she was ethnically and religiously Jewish and Israeli and was perceived to be a Zionist of equal protection of the laws through a policy and practice that treats Plaintiffs differently than similarly situated individuals. In so doing they discriminated against Ella's parents as well by treating their complaint differently than if it had been made on other grounds. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference.

126.     UPA and the UPA individual defendants, have knowingly allowed students to discriminate against and harass Ella because she is ethnically and religiously Jewish and Israeli and is perceived to be a Zionist. They have knowingly failed to address Ella and her parents' complaint because they are ethnically and religiously Jewish and Israeli and are perceived to be Zionists. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

127.     There was no legitimate or compelling state interest for any of this, nor any narrowly tailored response to serve such an interest.

128.     Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

129.     As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

130.     As a direct and proximate result of the action and inaction of Thurmond, Dewan, Bonduris, UPA and the UPA individual defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial,

including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**FOURTH CLAIM, 42 U.S.C. § 1983, Freedom of Speech**

131.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

132.    Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

133.    The First Amendment assures "freedom of speech."

134.    42 U.S.C. section 1983 affords protection from the "deprivation of any rights … secured by the Constitution."

135.    Dewan and Bonduris failed to address Plaintiffs' complaints and concerns that Ella was being harassed and discriminated against because she identified as Israeli-American, Jewish, and a Zionist, and because she spoke Hebrew to friends and family while on campus. In so doing they discriminated against Ella's parents as well by treating their complaint differently than if it had been made on other grounds. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference.

136.    UPA and the UPA individual defendants, have knowingly allowed students to discriminate against and harass Ella because she identified as Israeli-American, Jewish, and a Zionist, and because she spoke Hebrew to friends and family while on campus. They have knowingly failed to address Ella and her parents' complaint because they identified themselves as Israeli-American, Jewish, and Zionists. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of

Ella and her family, was deliberate indifference. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

137.    There was no legitimate or compelling state interest for any of this, nor any narrowly tailored response to serve such an interest.

138.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

139.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

140.    As a direct and proximate result of the action and inaction of Dewan, Bonduris, UPA and the UPA individual defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**FIFTH CLAIM, California Constitution Art. I, § 2(a), Freedom of Speech**

141.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

142.    The California Constitution guarantees "[e]very person may freely speak ... sentiments on all subjects." Cal. Const. art. I, § 2(a).

143.    Dewan and Bonduris failed to address Plaintiffs' complaints and concerns that Ella was being harassed and discriminated against because she identified as Israeli-American, Jewish, and a Zionist, and because she spoke Hebrew to friends and family while on campus. In so doing they discriminated against Ella's parents as well by treating their complaint differently than if it had been made on other grounds. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference.

144.    UPA and the UPA individual defendants, have knowingly allowed students to discriminate against and harass Ella because she identified as Israeli-American, Jewish, and a Zionist, and because she spoke Hebrew to friends and family while on campus. They have knowingly failed to address Ella and her parents' complaint because they identified themselves as Israeli-American, Jewish, and Zionists. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

145.    There was no legitimate or compelling state interest for any of this, nor any narrowly tailored response to serve such an interest.

146.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

147.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms,

including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

148.    As a direct and proximate result of the action and inaction of Dewan, Bonduris, UPA and the UPA individual defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**SIXTH CLAIM, 42 U.S.C. § 1983, Free Exercise Clause**

149.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

150.    The First Amendment to the Constitution protects the "free exercise" of one's religion.

151.    42 U.S.C. section 1983 affords protection from the "deprivation of any rights … secured by the Constitution."

152.    Dewan and Bonduris failed to address Plaintiffs' complaints and concerns that Ella was being harassed and discriminated against because she identified as Israeli-American, Jewish, and a Zionist, and because she spoke Hebrew to friends and family while on campus. In so doing they discriminated against Ella's parents as well by treating their complaint differently than if it had been made on other grounds. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference.

153.    UPA and the UPA individual defendants, have knowingly allowed students to discriminate against and harass Ella because she identified as Israeli-American, Jewish, and a Zionist, and because she spoke Hebrew to friends and family while on campus. They have knowingly failed to address Ella and her parents' complaint because they identified themselves as Israeli-American, Jewish, and Zionists. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

154.    There was no legitimate or compelling state interest for any of this, nor any narrowly tailored response to serve such an interest.

155.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

156.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

157.    As a direct and proximate result of the action and inaction Dewan, Bonduris, UPA and the UPA individual defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not

limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**SEVENTH CLAIM, California Constitution Art. I, § 4 Free Exercise Clause**

158.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

159.     The California Constitution guarantees "[f]ree exercise and enjoyment of religion without discrimination or preference." Cal. Const. art. I, § 4.

160.     Dewan and Bonduris failed to address Plaintiffs' complaints and concerns that Ella was being harassed and discriminated against because she identified as Israeli-American, Jewish, and a Zionist, and because she spoke Hebrew to friends and family while on campus. In so doing they discriminated against Ella's parents as well by treating their complaint differently than if it had been made on other grounds. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference.

161.     UPA and the UPA individual defendants, have knowingly allowed students to discriminate against and harass Ella because she identified as Israeli-American, Jewish, and a Zionist, and because she spoke Hebrew to friends and family while on campus. They have knowingly failed to address Ella and her parents' complaint because they identified themselves as Israeli-American, Jewish, and Zionists. Doing nothing to either redress or prevent this discrimination and harassment, despite knowing of the anguish of Ella and her family, was deliberate indifference. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

162.     There was no legitimate or compelling state interest for any of this, nor any narrowly tailored response to serve such an interest.

163.     Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

164.     As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

165.     As a direct and proximate result of the action and inaction of Dewan, Bonduris, UPA and the UPA individual defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**EIGHTH CLAIM, 42 U.S.C. § 2000d et. seq., Title VI of the Civil Rights Act of 1964**

166.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

167.     Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

168.    CDE, SCCOE, SCCBOE and UPA receive financial assistance from the United States Department of Education and are therefore subject to suit under Title VI of the Civil Rights Act of 1964.

169.    Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, national origin, or ideology—is prohibited under Title VI.

170.    Ella was harassed and discriminated against for identifying as Israeli-American, Jewish and a Zionist. She was harassed and discriminated against for speaking Hebrew on campus. She was threatened for complaining of discrimination and harassment by other students. UPA knew all this and did nothing. CDE, SCCOE and SCCBOE each had supervisory responsibility over UPA and did nothing, either proactively or in response to the complaint made by Ella and her parents. By failing to investigate and address the complaint made by Ella and Elisa concerning Ella's treatment at UPA, Defendants compounded the injuries suffered by Plaintiffs.

171.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

172.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

173.    As a direct and proximate result of the action and inaction of CDE, SCCOE, SCCBOE and UPA, Plaintiffs have suffered harm in the form of both general and special

damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**NINTH CLAIM, Cal. Educ. Code § 220, Prohibition of Discrimination**

174.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

175.    Section 220 of the California Education Code provides that "[n]o person shall be subjected to discrimination on the basis of … race or ethnicity … in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid." Cal. Educ. Code § 220.

176.    Section 220—as part of its prohibition of race or ethnicity discrimination—prohibits discrimination against Jews, Israelis and/or those perceived as Zionists. See Cal. Educ. Code § 201(g) ("It is the intent of the Legislature that this chapter shall be interpreted as consistent with … Title VI of the federal Civil Rights Act of 1964 ….").

177.    The State provides money for educational support not just to CDE but to SCCOE, SCCBOE and UPA. UPA both receives state financial assistance and enrolls pupils who receive state student financial aid.

178.    Ella was harassed and discriminated against for identifying as Israeli-American, Jewish and a Zionist. She was harassed and discriminated against for speaking Hebrew on campus. She was threatened for complaining of discrimination and harassment by other students. UPA and the UPA individual defendants knew all this and did nothing. CDE, SCCOE and SCCBOE, and their administrators, named individually herein, each

had supervisory responsibility over UPA and did nothing, either proactively or in response to the complaint made by Ella and her parents. By failing to investigate and address the complaint made by Ella and Elisa concerning Ella's treatment at UPA, all defendants compounded the injuries suffered by Plaintiffs.

179.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

180.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

181.    As a direct and proximate result of the action and inaction of all defendants herein, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**TENTH CLAIM, Cal. Gov. Code § 11135, Prohibition of Discrimination**

182.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

183.    Section 11135 of the California Government Code provides that "[n]o person in the State of California shall, on the basis of sex, race, color, religion, ancestry, national origin, ethnic group identification, age, mental disability, physical disability, medical condition, genetic information, marital status, or sexual orientation, be unlawfully denied

full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state." Cal. Gov. Code § 11135(a).

184.    Section 11135 prohibits discrimination against Jews, Israelis and/or those perceived as Zionists. See also Cal. Gov. Code § 11135(d).

185.    The State provides money for educational support not just to CDE but to SCCOE, SCCBOE and UPA. UPA both receives state financial assistance and enrolls pupils who receive state student financial aid.

186.    Ella was harassed and discriminated against for identifying as Israeli-American, Jewish and a Zionist. She was harassed and discriminated against for speaking Hebrew on campus. She was threatened for complaining of discrimination and harassment by other students. UPA, and the UPA individual defendants, knew all this and did nothing. CDE, SCCOE and SCCBOE, and their individual administrators named herein, each had supervisory responsibility over UPA and did nothing, either proactively or in response to the complaint made by Ella and her parents. By failing to investigate and address the complaint made by Ella and Elisa concerning Ella's treatment at UPA, defendants compounded the injuries suffered by Plaintiffs.

187.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

188.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms,

including the cost of private school tuition. Ella and her family have incurred significant

emotional distress as well as the financial obligations attendant upon putting Ella in

private school.

189.    As a direct and proximate result of the action and inaction of all defendants

herein, Plaintiffs have suffered harm in the form of both general and special damages in

an amount to be determined at trial, including but not limited to compensatory damages,

punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**ELEVENTH CLAIM, Cal. Civil Code § 51, Unruh Civil Rights Act**

190.    Plaintiffs incorporate by reference the allegations set forth in the preceding

paragraphs.

191.    The Unruh Civil Rights Act provides that "[a]ll persons within the jurisdiction of

this state are free and equal, and no matter what their sex, race, color, religion, ancestry,

national origin, disability, medical condition, genetic information, marital status, sexual

orientation, citizenship, primary language, or immigration status are entitled to the full

and equal accommodations, advantages, facilities, privileges, or services in all business

establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

192.    "[R]ace, color, religion, ancestry, national origin, … citizenship, [and] primary

language" under this Act "includes a perception that the person has any particular

characteristic or characteristics within the listed categories or that the person is associated

with a person who has, or is perceived to have, any particular characteristic or

characteristics within the listed categories." Cal. Civ. Code § 51(e)(6).

193.    Liability for violation of section 51 is provided by section 52: "Whoever denies,

aids or incites a denial, or makes any discrimination or distinction contrary to Section 51

… is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided." Cal. Civ. Code § 52(a).

194.    UPA and the individual defendants, by failing to address the Gaza-Israel conflict proactively and protect the rights of those identifying (or perceived to be identifying) as Israeli, Israeli-American, Jewish and/or Zionist in charter schools such as UPA, and by failing to respond to the facts related by Ella and her parents, allowed Ella to be subject to the intimidation of her classmates because of her Israeli-American, Jewish and perceived Zionist identities in violation of the Unruh Civil Rights Act. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

195.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

196.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

197.    As a direct and proximate result of the action and inaction of UPA and all individual defendants, Plaintiffs have suffered harm in the form of both general and

special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**TWELFTH CLAIM, Cal. Civil Code § 51.7, Ralph Civil Rights Act of 1976**

198.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

199.    The Ralph Civil Rights Act of 1976 provides that "[a]ll persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of" race or ethnicity. Cal. Civ. Code § 51.7(b)(1).

200.    Thurmond, by failing to act proactively, and Dewan and Bonduris, by refusing to act on the complaint filed by Ella and her parents, allowed Ella to be subject to the intimidation of her classmates because of her Israeli-American, Jewish and perceived Zionist identities in violation of the Ralph Civil Rights Act. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, Thurmond compounded the injuries suffered by Plaintiffs.

201.    UPA and the UPA individual defendants, by failing to respond to the facts related by Ella and her parents, allowed Ella to be subject to the intimidation of her classmates because of her Israeli-American, Jewish and perceived Zionist identities in violation of the Ralph Civil Rights Act. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

202.     Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

203.     As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

204.     As a direct and proximate result of the action and inaction of UPA and all individual defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**THIRTEENTH CLAIM, Cal. Civil Code § 52.1, Tom Bane Civil Rights Act**

205.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

206.     The Tom Bane Civil Rights Act provides a right of action against any "person or persons, whether or not acting under color of law, [who] interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]." Cal. Civil Code § 52.1(b).

207.    The CDE and Thurmond, by failing to act proactively, and SCCOE and Dewan and Bonduris, by refusing to act on the complaint filed by Ella and her parents, allowed Ella to be subject to the intimidation of her classmates because of her Israeli-American, Jewish and perceived Zionist identities in violation of the Tom Bane Civil Rights Act. By failing to investigate and address the complaint made by Ella and Elisa before the CDE concerning Ella's treatment at UPA, CDE and Thurmond compounded the injuries suffered by Plaintiffs.

208.    SCCBOE, by failing to act proactively, allowed Ella to be subject to the intimidation of her classmates because of her Israeli-American, Jewish and perceived Zionist identities in violation of the Tom Bane Civil Rights Act. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, SCCBOE compounded the injuries suffered by Plaintiffs.

209.    UPA and the UPA individual defendants, by failing to respond to the facts related by Ella and her parents, allowed Ella to be subject to the intimidation of her classmates because of her Israeli-American, Jewish and perceived Zionist identities in violation of the Ralph Civil Rights Act. By failing to investigate and address the complaint made by Ella and Elisa before it concerning Ella's treatment at UPA, UPA and Porter compounded the injuries suffered by Plaintiffs.

210.    Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

211.    As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms,

including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

212.     As a direct and proximate result of the action and inaction of all defendants herein, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**FOURTEENTH CLAIM, Cal. Bus. and Prof. Code § 17200, Unfair Competition**

213.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

214.     The so-called "unfair competition" statute prohibits any business practice that is unlawful or unfair.

215.     UPA and Porter allowed Ella's classmates to harass, threaten, and assault her because of her Israeli-American, Jewish and perceived Zionist identities in violation of the law and unfairly.

216.     Ella was harassed and threatened for identifying as Israeli-American. She was harassed and threatened for speaking Hebrew on campus. She was harassed and threatened for complaining of discrimination and harassment by other students. UPA and the UPA individual defendants, knew all this and did nothing. This was a business practice that was deliberately indifferent to the suffering of Ella and her family.

217.     Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

218.     As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

219.     As a direct and proximate result of the action and inaction of UPA and the UPA individual defendants, Plaintiffs have suffered harm in the form of expenses incurred in an amount to be determined at trial, including but not limited to tuition for private schooling, and Plaintiffs are entitled to restitution, along with pre-judgment and post-judgment interest.

**FIFTEENTH CLAIM, Breach of Contract**

220.     The UPA registration form and Student-Family Handbook constituted a contract between UPA and Ella and her family, under which UPA made certain promises in exchange for agreeing to attend UPA. As a result of that agreement, UPA received State and federal funds to educate Ella.

221.     As a result of the discrimination and harassment Ella experienced, violation of state and federal law and policy as set forth in the contract and otherwise, UPA breached this contract.

222.     Because UPA refused to provide Ella and her family the same contracted-for benefits as other white students and families, they deprived Ella and her family of the benefits of contract.

223.     Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

224.     As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered emotional and physical stress that has diverted time, attention, and focus from study, and by other harms. Ella and her family have incurred significant emotional distress as well as the financial obligations attendant upon putting Ella in private school.

225.     As a direct and proximate result of UPA's action and inaction, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**SIXTEENTH CLAIM, Negligence/Negligent Infliction of Emotional Distress**

226.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

227.     Thurmond, Dewan, Bonduris, Porter and the UPA individual defendants each owed a duty of care to Ella as a student at UPA and to Ella's parents: Thurmond, as the head of the education system in California; Dewan as the head of the county education system of relevance and Bonduris as her delegee; UPA as an institution providing care to and supervision of minors such as their daughter, and the UPA individual defendants in their role as administrators responsible in their own respective ways for Ella's safety at school.

228.     Defendants breached that duty.

229.     CDE and Thurmond, SCCOE and SCCBOE and Dewan and Bonduris, each breached their respective duties, by failing to take proactive steps to prevent harassment and discrimination of students on the basis of identity, actual or perceived, as Israeli, Israeli-American, Jewish and/or Zionist, and by failing to address the complaint made by Ella and her family, allowed Ella's classmates to harass, threaten, and assault her because of her Israeli-American, Jewish and perceived Zionist identities in violation of the law and in a way that was unfair to her. UPA and the UPA individual defendants breached their respective duties, by failing to take proactive steps to prevent harassment and discrimination of students on the basis of identity, actual or perceived, as Israeli, Israeli-American, Jewish and/or Zionist, and by failing to address the ongoing complaints of student behavior made by Ella and her family, allowed Ella's classmates to harass, threaten, and assault her because of her Israeli-American, Jewish and perceived Zionist identities in violation of the law and in a way that was unfair to her.

230.     Ella was harassed and threatened for identifying as Israeli-American. She was harassed and threatened for speaking Hebrew on campus. She was harassed and threatened for complaining of discrimination and harassment by other students. All defendants knew all this and did nothing.

231.     Ella's family pulled her from UPA as a result; she is now enrolled in a private school, where she is and feels safe.

232.     As a result, Ella has been injured by losing access to educational opportunities, been denied equal participation in the life of the school, suffered serious emotional and physical stress that has diverted time, attention, and focus from study, and by other harms, including the cost of private school tuition. Ella and her family have incurred

serious emotional distress as well as the financial obligations attendant upon putting Ella in private school.

233.    As a direct and proximate result of the action and inaction of all defendants, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, nominal damages, and pre-judgment and post-judgment interest.

**PRAYER FOR RELIEF**

234.    Wherefore, Plaintiffs respectfully request that the Court:

a.    Declare that Defendants have violated the First and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, Sections 1981 and 1983, article 1 of the California Constitution, the California Education Code, the Ralph Civil Rights Act of 1976, and the Tom Bane Civil Rights Act, the unfair competition statute, as well as acts constituting breach of contract and negligence/negligent infliction of emotional distress;

b.    Award Plaintiffs compensatory, punitive, and nominal damages, and restitution, for the loss of each of their rights under federal and state law as appropriate and restitution as appropriate;

c.    Award Plaintiffs the costs of this action and reasonable attorneys' fees; and

d.    Award such other and further relief as the Court deems equitable and just.

///

///

///

///

**JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated: October 23, 2024

Respectfully submitted,

*David Rosenberg-Wohl*

David M. Rosenberg-Wohl

HERSHENSON ROSENBERG-WOHL
A PROFESSIONAL CORPORATION

COMPLAINT - 55